Michael PROWS, Petitioner,

v.

INDUSTRIAL COMMISSION OF UTAH,
Bergin Brunswig Company, and Associated Indemnity Company, Respondents.

No. 16456.

Supreme Court of Utah.

April 4, 1980.

Bruce J. Nelson of Nielsen, Henriod, Gottfredsen & Peck, Salt Lake City, for petitioner.

Robert B. Hansen, Atty. Gen., Frank V. Nelson, Asst. Atty. Gen., Stuart L. Poelman, Salt Lake City, for respondents.

WILKINS, Justice:

This is an appeal from an Order of the Industrial Commission (hereafter "Commission") denying the application for Workmen's Compensation benefits by Michael Prows (hereafter "Petitioner").

The facts of this case are essentially undisputed. Petitioner was employed as a truck driver by Respondent Bergin Brunswig Company (hereafter "Bergin"). His duties included loading medical supplies onto his delivery truck and making deliveries to doctors, hospitals, and clinics.

The boxes containing the medical supplies measured approximately eleven and one-half by twenty-four inches, and each box was secured by elastic bands (also described as "rubber bands"). Each rubber band was approximately twelve inches long by three-eighths inch wide.

Testimony before the administrative law judge established that the rubber bands were used by some of Bergin's employees for "rubber bands fights". Petitioner and one of his co-employees testified that the "fights" were an almost daily occurrence. One of Bergin's supervisors testified that he observed such "fights" perhaps two or three times a month, and that when he observed one he discouraged its continuation.

On March 3, 1978, Petitioner was engaged in his usual assigned duties and was loading supplies on his delivery truck. As he was unloading boxes of supplies from a hand truck and onto his delivery truck, he was hit by one or two rubber bands which were

flipped at him by two co-employees standing nearby. Petitioner thereupon flipped a rubber band back at his "attacker". One of the co-employees then ripped an approximately eighteen inch long piece of wood off a nearby pallet and came toward Petitioner brandishing the wood like a sword. Petitioner took the wood from his co-employee, placed a rubber band between the handles of his hand truck and attempted to shoot the wood into the air in a slingshot fashion. The piece of wood, instead of sailing into the air, struck Petitioner in the right eye, severely injuring him.

In denying compensation the administrative law judge found, inter alia, that there had been numerous incidents of "horseplay" indulged in by Bergin's employees, including flipping rubber bands, and that this type of activity had been discouraged and was not condoned by Bergin; that the horseplay represented a "complete abandonment of the employee's duties"; and that the petitioner had "failed to prove that his accident arose out of or was in the scope of his employment." [1] In denying Petitioner's Motion for Review, the Commission adopted the administrative law judge's Findings of Fact, Conclusions of Law, and Order.

Section 35–1–45 [2] of Utah's Workmen's Compensation Act provides in pertinent part:

Every employee . . . who is injured . . . by accident arising out of or in the course of his employment, wheresoever such injury occurred, provided the same was not purposely self-inflicted, shall be entitled to receive and shall be paid, such compensation for loss sustained on account of such injury . . as is herein provided. [3]

In discussing construction of the act and the underlying purposes of the act this Court in *Chandler v. Industrial Commission*, [4] stated:

We are also reminded that our statute [now § 68–3–2] requires that the statutes of this state are to be "liberally construed with a view to effect the objects of the statutes and to promote justice."

\* \* \* \* \* \*

In this connection it must be remembered that the compensation provided for in the act is in no sense to be considered as damages for the injured employé or to his dependents in case death supervenes. The right to compensation arises out of the relation existing between employer and employé, and that the injury arises out of [or] in the course of the employment. Under such an act the costs and expenses of conducting the business or enterprise, including compensation for injuries to employés or other casualties, must be taxed to the business. The theory of the Compensation Act is that the whole cost and expense of conducting the business as aforesaid is added to the cost of the articles that are produced and sold, and hence, in the long run, such costs and expenses are borne by the public; that is, by the consumers of the articles produced. The purpose of such an act, therefore, is to protect the employé and those dependent upon him, and in case of his serious injury or death to provide adequate means for the support of those dependent upon him. In view, therefore, that in case of total disability or death of the employé his dependents might be-

---

1. The concept of "Scope of Employment" is one foreign to the law of workmen's compensation, belonging rather in the law of master and servant. Therefore, petitioner can in no way be considered to have the burden of proving that the accident "was in the scope of his employment."

2. All references are to Utah Code Ann., 1953, as amended.

3. It must be kept clearly in mind that the statute requires that the injury arise in the course

of employment, not that the injured worker *be* in the course of his employment. A definition of the term "course of employment" is found in 1 Larson, *The Law of Workmen's Compensation* (1979), § 14: "when it takes place within the period of the employment at a place where the employee reasonably may be, and while he is fulfilling his duties or engaged in doing something incidental thereto."

4. 55 Utah 213, 217–218, 184 P. 1020, 1021–1022 (1919).

come the objects of public charity, such a calamity is avoided by requiring the business or enterprise to provide for such dependents, with the right of the employer to add the amount that is paid out to the cost of producing and selling the product of such business or enterprise. The beneficent purposes of such acts are therefore apparent to all, and for that reason, if for no other, should receive a very liberal construction in favor of the injured employé. We are all united upon the proposition that in view of the purposes of such acts, in case there is any doubt respecting the right to compensation, such doubt should be resolved in favor of the employé or of his dependents as the case may be.

This Court, along with the courts of other jurisdictions, has recognized that concepts of negligence, contributory negligence, fault, and similar tort concepts have no place within the remedial framework of the compensation act. In *Twin Peaks Canning Co. v. Industrial Commission*,[5] this Court stated:

> Our statute only exclude[d] those injuries which are "purposely self-inflicted." As we read the statute, therefore, it is not enough that the employé merely disregards some rule, regulation, or order of the master, since such conduct may constitute nothing more than ordinary negligence on the part of the employé, and mere negligence does not destroy the right to compensation.

Likewise, in *M & K Corporation v. Industrial Commission*,[6] we stated:

We must keep in mind that neither negligence [n]or wilful misconduct, even though such were the sole proximate cause of his death, would defeat an award in this case. Under Sec. [35–1–45], a recovery is granted in every case where an employee is killed by accident arising in the course of his employment, "provided the same is not purposely self-inflicted."[7]

With these basic principles in mind, we turn now to an analysis of whether and under what circumstances injuries sustained as a result of "horseplay" on the part of an employee may not be compensated under the act.

In his treatise, *The Law of Workmen's Compensation* (1979), Professor Arthur Larson (hereafter "Larson") lists four "actual or suggested treatments of the problem" of participants in horseplay:[8]

1. The "aggressor defense" which results in the denial of compensation in any case where the injured employee instigated or participated in the horseplay. It is reasoned that by instigating the horseplay the employee has voluntarily stepped aside from his employment.[9]

2. The New York Rule which permits even an instigator of or participant in horseplay to recover if the horseplay was a regular incident of the employment as distinguished from an isolated act.[10]

3. The view that an instigator or participant should be treated the same as a nonparticipant since it is the conditions of the employment that induce the horseplay.[11]

---

**5.** 57 Utah 589, 603, 196 P. 853, 859, 20 A.L.R. 872 (1921).

**6.** 112 Utah 488, 504, 189 P.2d 132, 139–140 (1948).

**7.** See also *Maltias v. Equitable Life Assurance Society of United States*, 93 N.H. 237, 40 A.2d 837 (1944); *Crilly v. Ballou*, 353 Mich. 303, 91 N.W.2d 493 (1958); *Walsh v. Charles Olson & Sons, Inc.*, 285 Minn. 260, 172 N.W.2d 745 (Minn.1969); *Carvalho v. Decorative Fabrics Company*, 117 R.I. 231, 366 A.2d 157 (R.I.1976); *Secor v. Penn Service Garage*, 19 N.J. 315, 117 A.2d 12 (1955); *Shapaka v. State Compensation Commissioner*, 146 W.Va. 319, 119 S.E.2d

821 (W.Va.1961); *Singleton v. Younger Brothers, Inc.*, 247 So.2d 273 (La.App.1971); *Gurski v. Susquehanna Coal Company*, 262 Pa. 1, 104 A. 801 (Pa.1918); *Hartford Accident and Indemnity Company v. Cardillo*, 112 F.2d 11 (D.C. App.1940), cert. denied 310 U.S. 649, 60 S.Ct. 1100, 84 L.Ed. 1415 (1940).

**8.** 1A Larson § 23.20.

**9.** Id. at 5–126.

**10.** Id.

**11.** Id.

4. The rule proposed by Larson that an instigator or participant should recover if, by ordinary "course of employment" standards, his indulgence in horseplay does not amount to a *substantial deviation* from the employment.[12]

■ As the basis for the fourth approach above, Larson proposes a four-part test to analyze any particular act of horseplay to determine whether the horseplay constitutes such a substantial deviation as to justify denying compensation to a participant therein. Whether initiation of or participation in horseplay is a deviation from course of employment depends on (1) the extent and seriousness of the deviation, (2) the completeness of the deviation (i. e., whether it was commingled with the performance of duty or involved an abandonment of duty), (3) the extent to which the practice of horseplay had become an accepted part of the employment, and (4) the extent to which the nature of the employment may be expected to include some such horseplay.[13]

This Court has heretofore had only one occasion to examine the issue of horseplay in the workmen's compensation setting. In *Twin Peaks Canning Company v. Industrial Commission*, supra, an award of compensation to the dependents of a worker who was killed as a result of horseplay in which "the deceased was the instigator and the principal, if not the sole actor"[14] was affirmed by this Court. The analysis in *Twin Peaks* turned on whether the deceased employee could be said to have been killed while "in the course of" his employment in light of his activities in using an elevator located on

the premises of his employer, the use of which elevator by the deceased was allegedly forbidden by the employer. Although the words "deviation from employment" are nowhere found in the *Twin Peaks* opinion, it is clear that the Court was wrestling with the question of when a deviation from the assigned duties of an employee was sufficient to take that employee out of the course of his employment. In our view, the analysis in *Twin Peaks* though lacking the formal structure of the test proposed by *Larson*, supra, is founded on the same general principles.[15] We therefore adopt Larson's four-part test to determine whether a particular act of horseplay constitutes such a deviation that it can be said that the resulting injury did not arise in the course of the employment and hence is not compensable.

(1) *Extent and seriousness of the deviation.*

In *Twin Peaks*, supra, the Court observed:

A careful reading of the decided cases will, however, disclose that the mere fact that the injured employé, at the time of the accident, was not in the discharge of his usual duties or was not directly engaged in anything connected with those duties, does not necessarily prevent him from recovering compensation in case of accidental injury. In that connection it must be remembered that, while a human being may do no more than what a machine might do, yet he can not be classed as a machine merely.[16]

---

12. Id.

13. Id. at 5–122.

14. 57 Utah at 601, 196 P. at 858.

15. Mr. Justice Hall in his dissenting opinion distinguishes *Twin Peaks* from the case at bar and emphasizes that the Court there considered the case borderline. The dissent focuses particularly on the fact that *Twin Peaks* involved a 14-year old boy while Petitioner here was almost 22 years old at the time he was injured. A close reading of *Twin Peaks* reveals that the dicta concerning the worker's age were part of an analysis of the effect of the violation

of a rule of the employer and whether the worker's death could be considered to have been "purposely self-inflicted." *Twin Peaks*, supra, 57 Utah at 603–604, 196 P. at 858–859.

16. Id. at 602, 196 P. at 858. See also *Leonbruno v. Champlain Silk Mills*, 229 N.Y. 470, 128 N.E. 711 (1920); *Piatek v. Plymouth Rock Provision Company*, 15 A.D.2d 405, 224 N.Y.S.2d 634 (1962); *Diaz v. Newark Industrial Spraying, Inc.*, 35 N.J. 588, 174 A.2d 478 (1961); *Carvalho v. Decorative Fabrics Company*, supra; *Hartford Accident & Indemnity Company v. Cardillo*, supra.

■ Recognizing that "a little nonsense now and then is relished by the best of [workers]," [17] it is clear that the better reasoned decisions make allowances for the fact that workers cannot be expected to attend strictly to their assigned duties every minute they are on the job. That is not to say that substantial excursions from job assignments need be tolerated or if injury occurs during such excursions, compensation need be paid. In the case at bar, Petitioner was engaged in the performance of his assigned duties when he was playfully "attacked" by co-workers flipping rubber bands. Petitioner then momentarily set aside his duties and took up the challenge. In an exchange lasting a matter of minutes, Petitioner was injured. As Larson points out:

> The substantial character of a horseplay deviation should not be judged by the seriousness of its consequences in the light of hindsight, but by the extent of the work-departure in itself. This is not always easy to do, especially when a trifling incident escalates or explodes into a major tragedy.[18]

We think the converse of this principle is likewise true; the fact that a major tragedy has occurred should not dictate an award of compensation when that tragedy resulted from a deviation so extensive and serious that the employment can be said to have been abandoned. However, it is our opinion that the deviation involved in the case at bar was short in duration and when disassociated from the serious consequences which resulted, relatively trivial.

(2) *Completeness of the deviation.*

Petitioner was, at the time he was "attacked" by his co-employees, engaged in the discharge of his duties. Had he not been injured, he would presumably have completed loading the truck and carried on with his deliveries. The horseplay he engaged in was clearly "commingled with the performance of duty" and hence did not constitute

an "abandonment of duty." Larson points out:

> . . . the particular act of horseplay is entitled to be judged according to the same standards of exten[t] and duration of deviation that are accepted in other fi[e]lds, such as resting, seeking personal comfort, or indulging in incidental personal errands. If an employee momentarily walks over to a co-employee to engage in a friendly word or two, this would nowadays be called an insubstantial deviation. If he accompanies this friendly word with a playful jab in the ribs, surely it cannot be said that an entirely new set of principles has come into play. The incident remains a simple human diversion subject to the same tests of extent of departure from the employment as if the playful gesture had been omitted.
>
> At the other extreme, there are cases in which the prankster undertakes a practical joke which necessitates the complete abandonment of the employment and the concentration of all his energies for a substantial part of his working time on the horseplay enterprise. When this abandonment is sufficiently complete and extensive, it can only be treated the same as abandonment of the employment for any other personal purpose, such as an extended personal errand or an intentional four-hour nap.[19] (footnotes omitted)

(3) *Extent to which horseplay has become a part of the employment.*

The evidence adduced at the hearing before the administrative law judge was conflicting on the frequency of "rubber band fights," but clearly such "fights" had become a part of the employment, whether the "fights" occurred "daily" or "two or three times a month."

As Larson points out:

> The controlling issue is whether the custom had *in fact* become a part of the employment; the employer's knowledge

---

**17.** *Ognibene v. Rochester Manufacturing Company,* 298 N.Y. 85, 80 N.E.2d 749 (1948) (Desmond, J., dissenting, 80 N.E.2d at 751).

**18.** 1A Larson at 5–152.

**19.** Id. at 5–142 to 5–143.

of it can make it neither more nor less a part of the employment—at most it is evidence of incorporation of the practice into the employment.[20] (italics in original)

We do not consider the fact that apparently no employee of Bergin had ever attempted before to flip a piece of wood with a rubber band as indicating that such a practice could not be considered a part of the employment. The elements of the practice, which must be conceded to have been part of the employment, were not significantly enlarged or so modified so as to no longer constitute a part of the employment.

(4) *Extent to which nature of employment may be expected to include some such horseplay.*

This element of Larson's approach focuses on the foreseeability of horseplay in any given employment environment and on the particular act of horseplay involved. Considerations which may enter into the analysis of this point include whether the work involves lulls in employment activity or is essentially continuous,[21] and the existence of instrumentalities which are part of the work environment and which are readily usable in horseplay situations.[22] This list is not intended to be exhaustive but rather illustrative of the possibilities. In the present case all of the elements which joined to result in Petitioner's injury—the hand truck, the rubber bands, and the piece of wood—were part and parcel of the work environment. It therefore is not difficult to foresee that horseplay of the type engaged in by Petitioner was to be expected.

By adopting the approach suggested by Larson, this Court does not intend the adoption of a test which by mechanical application will in cases involving horseplay dictate a "correct result". Indeed this approach is not susceptible of mechanical application but rather is intended as a method of analysis to assist the Industrial Commission in consideration of future cases coming before it involving horseplay. It is this Court's view that when the underlying policy of the compensation act is effectuated in the light of the analysis suggested herein, a rational result can be expected.

While we remain committed to the proposition that this Court will examine the evidence in a compensation case only to ascertain whether there is any substantial evidence in support of the findings of the Commission and whether the Commission has acted without or in excess of its jurisdiction,[23] under the facts of this case we believe as a matter of law that there was not a substantial deviation such that it can be said that the resulting injury did not arise in the course of the employment and hence is not compensible. The record herein reveals no substantial evidence supporting the finding of the Commission that by engaging in horseplay, Petitioner "completely abandoned" his duties and hence was not injured in the course of his employment. Therefore the Order of the Commission is reversed. Costs to Petitioner and against Bergin.

MAUGHAN and STEWART, JJ., concur.

HALL, Justice (dissenting):

I respectfully dissent.

In reversing the order of the Commission, the majority opinion rules "*as a matter of*

20. Id. at 5–133.

21. *Twin Peaks Canning Company v. Industrial Commission, supra*, 57 Utah at 602, 196 P. at 858.

22. See, e. g., *Johnson v. Loew's Inc.*, 7 A.D.2d 795, 180 N.Y.S.2d 826 (App.Div.1958) (involving a situation where an employee shot a paperclip into his own eye with a rubber band); *Stark v. State Industrial Accident Commission,* 103 Or. 80, 204 P. 151 (1922); *Piatek v. Plymouth Rock Provision Company, supra*; *Carvalho v. Decorative Fabrics Company, supra*; *Diaz v. Newark Industrial Spraying, Inc., supra.*

23. *Twin Peaks Canning Company v. Industrial Commission, supra*, 57 Utah at 596, 196 P. at 856.

*law* that there was not a substantial deviation" from petitioner's course of employment (emphasis added). My primary concern with such a ruling is that a decision as to whether one is injured by accident arising out of or in the course of his employment is not a law matter, but a factual one. Once the Commission has found the facts, this Court has traditionally refrained from disturbing such findings whenever there is substantial evidence to support them.[1]

The majority relies upon the case of *Twin Peaks Canning Company v. Industrial Commission*[2] as being consistent with its holding. On the contrary, in *Twin Peaks* the Court affirmed the findings of the Commission and acknowledged the standard of review referred to *supra*. Furthermore, the facts in *Twin Peaks* are readily distinguishable in several particulars. For example, in *Twin Peaks*, the fatal injury occurred during a lull in the work, at a time when there was no work to perform; in the instant case, petitioner was actively engaged in his work when he abandoned it for the purpose of "horseplay." Also, at the time of the accident in *Twin Peaks* the injured party was a minor (14 years of age) whereas in the instant case, petitioner was 22 years of age. The Court specifically acknowledged that *Twin Peaks* was a borderline case (which further suggests the importance of the *factual* determination) and that "if the deceased had been a man of mature years and experience, we might have reached a different conclusion."

The approach suggested by Professor Larson may well assist in determining whether the accident arises out of or in the course of one's employment. However, even if this four-step analysis is applied, it is the fact-finder (not this Court) which must evaluate and weigh each element individually and collectively. This includes the element the majority treats as a law mat-

ter, that of substantial deviation from petitioner's course of employment.

In the instant case, the petition admitted that at the time of the accident he was not performing an assigned duty. He also admitted that his injury resulted from his own act and that he was the "aggressor" in flipping the piece of wood, i. e., that his flipping of the wood was not a reaction of having been hit with an elastic band but was rather an independent, playful gesture. Testimony indicated that the employees had been warned about flipping elastic bands at each other and that apparently no employee of the company had ever before attempted to flip a projectile with an elastic band while on the job. Based on the evidence presented, the administrative law judge found as follows:

> The horseplay was not related in any way to the performance of the applicant's job duties but rather represents a complete abandonment of the employee's duties. At the time of the accident neither the applicant nor any of the other employees involved in the horseplay were carrying out their assigned tasks.
>
> The applicant has failed to prove that his accident arose out of or was in the scope of his employment.

In recognition of the prerogative it is of the fact-finder to judge the evidence and the inferences that may reasonably be drawn therefrom, I am of the opinion that the evidence is such that there is a reasonable basis upon which the Commission could remain unpersuaded that petitioner's injury "arose out of or in the course of his employment"; and, conversely, that the evidence does not rise to the level that requires reversal of the Commission's order and thus compels an award of benefits. In order to do so, the evidence must be uncontradicted or so overwhelming that all reasonable minds would necessarily so find. Such is not the case here, and I consequently see it

1. *Utah–Idaho Sugar Co. v. Industrial Commission*, 71 Utah 190, 263 P. 746 (1928). Specifically, we may not weigh the contradictory evidence for the purpose of interposing our own judgment as to what the facts are; rather, we

must construe the evidence in a light most favorable to sustaining the findings and order of the Commission. *Wiseman v. Village Partners*, Utah, 589 P.2d 754 (1978).

2. 55 Utah 589, 196 P. 853 (1921).

as our duty to affirm the Commission's order.[3]

I would affirm.

CROCKETT, C. J., concurs in the dissent of HALL, J.

---

3. See *Vause v. Industrial Commission*, 17 Utah 2d 217, 407 P.2d 1006 (1965), citing *Kent v. Industrial Commission*, 89 Utah 381, 57 P.2d 724 (1936), and *Kavalinakis v. Industrial Commission*, 67 Utah 174, 246 P. 698 (1926).